**GENERAL ELECTRIC COMPANY,
Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 99–172C.**

United States Court of Federal Claims.

Sept. 29, 2008.

Richard D. Bernstein, Washington, DC, for plaintiff. Howard Stanislawski and Ileana M. Ciobanu, Washington, DC, and Alan C. Brown, McLean, VA, of counsel.

C. Coleman Bird, U.S. Department of Justice, Washington, DC, with whom were Deputy Assistant Attorney General Michael F. Hertz, and Director Jeanne E. Davidson, for defendant. David D'Alessandris, U.S. Department of Justice, Washington, DC, and Stephen R. Dooley, Defense Contract Management Agency, Boston, MA, of counsel.

Alexander F. Wiles, Los Angeles, CA, for Amicus Curiae The DIRECTV Group, Inc. Alan C. Brown, McLean, VA, of counsel.

## OPINION

FIRESTONE, Judge.

This matter comes before the court on the parties' cross-motions for partial summary

judgment. This is the third partial summary judgment motion to be decided in this case.[1] At issue in these motions is whether the plaintiff, General Electric ("GE" or "plaintiff"), satisfied its segment closing adjustment obligations under Cost Accounting Standard ("CAS") 413.50(c)(12), *codified at* 48 C.F.R. § 9904.413–50(c)(12) (1993) ("CAS 413"),[2] when GE, in 1993, sold its business segment GE Aerospace ("GEA") to Martin Marietta Corporation ("MMC" or "Martin Marietta") and transferred, along with pension assets and liabilities to cover the transferred employees, an additional amount of pension assets and liabilities to Martin Marietta. GE, in that same year, also sold its business segment GE Machinery Apparatus Operation ("MAO") to Westinghouse Electric Corporation ("Westinghouse") and transferred an additional amount of pension assets and liabilities to Westinghouse in connection with the sale.[3] GE argues that the pension surplus transfers to MMC and Westinghouse satisfied all of GE's CAS 413 segment closing adjustment obligations triggered by the sale of the segments. The defendant, the United States ("defendant" or "government"), contends that GE has not satisfied its CAS 413 segment closing adjustment obligations through its transfers of sizeable pension surpluses to MMC and Westinghouse because the transfer of pension surpluses to MMC and Westinghouse should not be considered in evaluating GE's CAS 413 compliance. The government argues instead that, under CAS 413, GE must perform a segment closing adjustment calculation on only the portion of the segment's pension assets and liabilities that GE *retained* following the segment sales to MMC and Westinghouse. For the reasons set forth below, the court holds that: (1) the original CAS 413 required GE to perform a segment closing adjustment calculation on the entire sold segments, including the portion of the segments' pension assets and liabilities transferred to the buyers; (2) the government must consider any cost-saving benefits it obtained from the pension surplus transferred to the buyers in determining whether GE satisfied its segment closing adjustment obligations; and (3) material issues of fact preclude a determination of the amount of any benefit the government derived from the pension surplus transferred to the buyers. Accordingly, both parties' cross-motions for partial summary judgment are **GRANTED–IN–PART** and **DENIED–IN–PART.**[4]

1. On August 9, 2001, in the first decision, the court granted-in-part and denied-in-part the parties' cross motions for partial summary judgment, incorporating the reasoning set forth in *Teledyne, Inc. v. United States*, 50 Fed.Cl. 155 (2001), *aff'd sub nom. Allegheny Teledyne, Inc. v. United States*, 316 F.3d 1366 (Fed.Cir.2003), *cert. denied sub nom. General Motors Corp. v. United States*, 540 U.S. 1068, 124 S.Ct. 804, 157 L.Ed.2d 732 (2003). Order Granting–In–Part and Denying–In–Part the Parties' Cross–Motions for Partial Summary Judgment, *Gen. Elec. Co. v. United States*, No. 99–172C (Fed.Cl. Aug. 9, 2001). On May 27, 2004, in the second decision, the court granted the government's motion for partial summary judgment and denied GE's motion for partial summary judgment on the parties' interpretations of their obligations under the GE Advance Agreement. *Gen. Elec. Co. v. United States*, 60 Fed.Cl. 782 (2004).

2. While CAS 413 was revised in 1995, the contract at issue in this case predates those revisions, and, as such, is governed by the original version of CAS 413, which was promulgated in 1977 and became effective in 1978. 42 Fed.Reg. 37,191, 37,196 (July 20, 1977). References herein to "CAS 413" are to the original CAS 413 unless otherwise noted.

3. As discussed further *infra,* GE transferred pension assets and pension liabilities in conjunction with the sales of its segments. Because, in both instances, GE transferred pension assets in excess of pension liabilities, the amounts transferred were effectively a "pension surplus."

4. The surplus transfer question is also at issue in cases brought by Unisys Corporation ("Unisys") and The DIRECTV Group, Inc. ("DIRECTV"), both of which filed complaints in this court in connection with the sales of divisions involving government contracts from their companies. *See Unisys Corp. v. United States*, Case No. 05–281C; *The DIRECTV Group, Inc. v. United States*, Case No. 04–1414C. Unisys has filed a motion for partial summary judgment on the surplus transfer issue, and the government filed a cross-motion for partial summary judgment in that case. The parties in *Unisys* filed their briefs in support of their motions for partial summary judgment on the same schedule as the parties in this case. DIRECTV filed a brief as an amicus curiae in both this case and *Unisys.* Accordingly, the arguments presented by Unisys and DIRECTV will also be addressed in this Opinion (the parties are collectively referred to as "plaintiffs"). The court will issue a separate ruling in *Unisys* based on its decision in the present case.

## BACKGROUND

The following facts are not disputed unless otherwise noted.[5] Since the early 1900s, GE has maintained a pension plan for its employees that is known as the GE Pension Plan ("GEPP"). Plaintiff's Proposed Findings of Uncontroverted Fact ("PPFUF") 1. The GEPP is a defined benefit plan that provides, upon retirement, specific payments to GE's employees and their spouses based upon each employee's years of employment and compensation level. Compl. ¶ 16. A large portion of GE's business has historically consisted of contracts with the government; as such, the government has reimbursed GE for its pension contributions attributable to GE employees working on government contracts. *Id.* ¶ 20. The market value of assets in the GEPP has exceeded the actuarially-calculated liabilities of the GEPP, resulting in a pension surplus, since 1987. *Id.* ¶ 19, 20. As a result, since 1987 and for the duration of the existence of the pension surplus, GE has not made pension contributions to the GEPP. *Id.* ¶ 20. Similarly, due to the existence of the pension surplus, the government has not been charged and has not reimbursed GE for pension costs attributable to GE employees working on government contracts. *Id.*

In November 1992, GE and Martin Marietta (now a part of Lockheed Martin Corporation) announced their interest in Martin Marietta acquiring GEA. PPFUF 2. At that time, approximately 90% of GEA's business consisted of government contract work. The United States Navy subsequently objected to the transfer of MAO, one component of GEA, to Martin Marietta and directed its transfer instead to Westinghouse.

On November 22, 1992, GE and Martin Marietta entered into a Transaction Agreement ("Transaction Agreement") executing the sale of GEA to Martin Marietta. Defendant's Proposed Findings of Uncontroverted Fact ("DPFUF") 1; Def.'s App. at 72. On April 2, 1993, as a result of the sale, more than 30,000 active (as opposed to retired or otherwise "inactive") GE employees that were employed by GEA at the time of the sale were transferred to Martin Marietta. GE also agreed to transfer the pension assets and liabilities associated with these employees to Martin Marietta along with additional pension assets and liabilities. On May 27, 1993, GE transferred the MAO business segment and its 395 active employees to Westinghouse along with the pension assets and liabilities associated with these employees together with additional pension assets and liabilities. As part of these transactions, GE agreed to retain the pension obligations for those employees who had worked in the transferred segments but who were not transferred, such as the inactive employees who had retired from GE prior to the transfer.

### A. CAS 413

The accounting of pension costs in government contracts is governed by the CAS, 48 C.F.R. § 9904 (1977). The CAS "provide for the definition and measurement of costs, the assignment of costs to particular cost accounting periods, and the determination of the bases for the direct and indirect allocation of the total assigned costs to the contracts and other cost objectives of these periods." Restatement of Objectives, Policies, and Concepts, 42 Fed.Reg. 25,751 (May 19, 1977). The instant dispute centers on the requirements set forth under the original version of CAS 413.50(c)(12), which provided, in its entirety:

> If a segment is closed, *the contractor shall determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated.* The determination of actuarial liability shall give consideration to any requirements imposed by agencies of the United States Government. In computing the market value of assets for the segment, if the contractor has not already allocated assets to the segment, such an allocation shall be made in accordance with the requirements of paragraph

5. As detailed *supra* note 1, this is the third in a series of decisions issued by the court in this case. The facts surrounding the general dispute are set forth at length in *General Electric Co.,* 60 Fed.Cl. 782. The facts relevant to the instant dispute, the surplus transfer issue, are presented in specific detail below.

(c)(5)(i) and (ii) of this section. The market value of the assets allocated to the segment shall be the segment's proportionate share of the total market value of the assets of the pension fund. The calculation of the difference between the market value of the assets and the actuarial liability *shall be made as of the date of the event (e.g., contract termination) that caused the closing of the segment.* If such a date cannot be readily determined, or if its use can result in an inequitable calculation, the contracting parties shall agree on an appropriate date. *The difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously-determined pension costs.*[6]

42 Fed.Reg. 37,191, 37,198 (July 20, 1977) (emphasis added).

In determining the appropriate contributions for the GEPP, GE accounted for its pension costs using a composite approach. This meant that the pension contributions were calculated on the basis of various economic assumptions, including the assumptions that the covered employees would work for GE for their entire careers and that the amount invested would be sufficient to cover the pension liabilities of those employees. *See* CAS 413.30(a)(1), 42 Fed.Reg. at 37,196 (defining "actuarial assumption" as a "prediction of future conditions affecting pension cost; for example, mortality rate, employee turnover, compensation levels, pension fund earnings, changes in values of pension fund assets"). Therefore, if an employee did not in fact work for GE for his or her entire career, the amount that the government may

have contributed to the GEPP on account of that employee might have exceeded the amount of GE's ultimate pension liability for that individual. Similarly, if the value of the GEPP, which was invested by GE, exceeded or failed to meet the investment assumptions built into the pension cost model, the GEPP would become over– or under-funded. It was therefore possible, based on the success of GE's investment strategy, that the government may have over-contributed or under-contributed to the GEPP. Such was the case in the instant dispute.

CAS 413 requires contractors to amortize their actuarial gains and losses over a fifteen-year period. *See* CAS 413.50(a)(2), 42 Fed. Reg. at 37,197. For a segment performing government contract work, this amortization requirement allows for an adjustment, or correction, to the amount of pension cost calculated each year to account for the gains and losses of the previous fifteen years, which in essence corrects for the government's past over– or under-contributions to a contractor's pension plan. Upon a segment closing, however, the amortization process can no longer be used to make adjustments for past over– or under-contributions. The purpose of the segment closing adjustment required under CAS 413.50(c)(12) is to provide a similar correction to pension costs previously reimbursed by the government, as explained by the Cost Accounting Standards Board ("CASB")[7] in Prefatory Comment No. 12 to the original CAS:

> As a general rule, the Standard being promulgated today is based on the concept that material actuarial gains and losses

---

6. In effect, CAS 413.50(c)(12) required a contractor, at the time of the segment closing, to perform a *segment closing adjustment calculation* on the segment's pension assets and liabilities to determine the portion of the surplus or deficit attributable to the government's pension contributions. If the segment's pension had a surplus at the time of the segment closing, the contractor then had a *segment closing adjustment obligation* to the government in the amount of the government's share of the segment's pension surplus.

7. The original CASB was established in 1970 as an agency of Congress through the Defense Production Act Amendments of 1970, Pub.L. No. 91–379, § 719, 84 Stat. 796 (1970), *codified at* 50 U.S.C.App. § 2168 (repealed 1988). The CASB

was authorized to: (1) promulgate the CAS, designed to achieve uniformity and consistency in the cost accounting principles followed by government contractors and subcontractors with government contracts valued in excess of $100,000; and (2) establish regulations to require government contractors and subcontractors, as a condition of contracting, to disclose in writing their cost accounting practices, to follow the disclosed practices consistently, and to comply with the CAS. The original CASB ceased functioning on September 30, 1980. In March 1989, the new CASB was established pursuant to Pub.L. No. 100–679, § 5, 102 Stat. 4055 (1988), *codified at* 41 U.S.C. § 422 (2003).

applicable to a segment will be taken into account in future cost accounting periods in determining the costs for the segment. However, a problem arises in cases where a segment is closed. *Because there are no future periods in which to adjust previously-determined pension costs applicable to that segment, a means must be developed to provide a basis for adjusting such costs.*

42 Fed.Reg. at 37,195 (emphasis added). As discussed in *General Electric Co.*, "CAS 413 not only establishes the rules that govern how contractors should account for pension costs, but also provides for an eventual settling-up of pension costs between contractors and the government when a segment belonging to the contractor ceases to engage in government contracting." 60 Fed.Cl. at 785.

In 1995, the CASB amended the original CAS 413. 60 Fed.Reg. 16,534, 16,549 (Mar. 30, 1995). Specifically, CAS 413.50(c)(12) was amended to include seven new subsections. *Id.* at 16,552. The new CAS still requires that a segment closing adjustment calculation be performed as outlined under the original CAS; however, the new subsection (v) provides further guidance regarding segment closing adjustment calculations where, as in this case, the seller transfers some pension assets and liabilities to the buyer and retains others. The new CAS 413.50(c)(12)(v) provides as follows:

> If a segment is closed due to a sale or other transfer of ownership to a successor in interest in the contracts of the segment and all of the pension plan assets and actuarial accrued liabilities pertaining to the closed segment are transferred to the successor segment, then no adjustment amount pursuant to this paragraph (c)(12) is required. *If only some of the pension plan assets and actuarial accrued liabilities of the closed segment are transferred, then the adjustment amount required under this paragraph (c)(12) shall be determined based on the pension plan assets and actuarial accrued liabilities remaining with the contractor.* In either case, the effect of the transferred assets and liabilities is carried forward and recognized

in the accounting for pension cost at the successor contractor.

*Id.* (emphasis added).

## B. The Conditions of the Sale of GEA to Martin Marietta

The sale of GEA to MMC generated various agreements between the parties to the sale and, because it involved government contracts, also required the government's approval. Pursuant to the Transaction Agreement between GE and Martin Marietta, GE agreed to transfer assets from the GEPP to Martin Marietta to cover the GEA transferred employees. Compl. ¶ 33. Specifically, the Transaction Agreement provided:

> (a) As of December 31, 1992, GE shall cause the trustee of the [GEPP] to segregate in cash or cash-equivalents $1,000,000,000, representing a portion of the total assets (estimated by GE and understood by MMC to be approximately $1,650,000,000) allocable to Transferred Employees as of December 31, 1992 and to invest such assets (i) in ninety (90) day Treasury Bills or (ii) as mutually agreed in writing by GE and MMC....
>
> (c) On the Closing Date, GE shall cause the trustees of the [GEPP] to transfer in cash (or in the form of such securities or other property as may be agreed by GE and Parent) the assets segregated pursuant to paragraph (a) above, including earnings or losses attributable to the investment of such assets in the manner provided in paragraph (a) above during the period from December 31, 1992 to the Closing Date, to the appropriate trustee designated by Parent under the trust agreement forming a part of the Successor Pension Plan, ...
>
> (f) Transferred Employees shall cease to accrue benefits under the [GEPP] as of the Closing Date and in consideration for the transfer of assets described herein, Parent shall, effective as of the Closing Date, assume all of the obligations of GE and of its Affiliates in respect of benefits accrued by Transferred Employees under the [GEPP] on or prior to the Closing Date.

Def.'s App. at 80–83.

On March 29, 1993, Martin Marietta assumed and began to perform all contracts

existing at that time between the government and GEA pursuant to an Advance Agreement between Martin Marietta and the government ("MMC Advance Agreement"). PPFUF 3; Pl.'s Ex. 58. GE's interest in those contracts ended with the amounts earned as of March 28, 1993. PPFUF 3. In addition, in an effort to "reach understandings between GE and the Government, thereby avoiding subsequent disputes, including those over costs arising from" the sale, the government and GE entered into an Advance Agreement ("GE Advance Agreement"), with an effective date of March 29, 1993, to address, among other issues, the transfer of pension assets. Pl.'s App. at 0071 (tab 8). With regard to the transfer of pension assets, the GE Advance Agreement provided:

> GE pension assets will be transferred to a trust designated by MMC to fulfill obligations to employees transferred with the Business. The amount of pension assets to be transferred was estimated in the Transaction Agreement dated November 22, 1992 to be $1,650,000,000 but a final figure will depend upon the GE employees actually transferred to MMC. Subsequent to the Effective Date and once transferred, the pension assets and related employee liabilities will become the responsibility of the designated MMC plan.

> The transfer of GE pension assets to MMC is intended to cover transferred employees. GE retirees, including those employees who retire or terminate prior to April 4, 1993, are not considered transferred employees. GE will retain the pension liabili-

ty for any GE employees that retire or terminate prior to April 4, 1993.

Pl.'s App. at 0076 (tab 8). To further protect its interests, the government entered into a Novation Agreement with Martin Marietta, effective April 2, 1993, which provided as follows:

> Except as [otherwise] set forth ... the Transferor [GE] and the Transferee [Martin Marietta] agree that the Government is not obligated to pay or reimburse either of them for, or otherwise give effect to, any costs, taxes, or other expenses, or any related increases, directly or indirectly arising out of or resulting from the transfer or this Agreement, other than those that the Government in the absence of this transfer or Agreement would have been obligated to pay or reimburse under the terms of the contracts.

Pl.'s App. at 0067 (tab 7).

As detailed above, pursuant to the GE Advance Agreement, subsequent to March 29, 1993, GE pension assets and liabilities were to be transferred to a trust designated by Martin Marietta in an amount to be determined, and, after that transfer, the pension liabilities for active employees of GEA would become the responsibility of the designated Martin Marietta plan.[8] PPFUF 3; Pl.'s App. at 0071 (tab 8). On April 6, 1993, GE transferred the first installment of its pension assets and liabilities to Martin Marietta's designated plan. All of the pension assets and liabilities that were transferred as a result of the sale of GEA were put into a separate Martin Marietta plan established solely for the acquired GEA segment.[9,10]

---

8. GE performed a similar transfer in connection with the sale of MAO to Westinghouse. According to GE, the final pension asset transfer to Westinghouse on account of MAO's active employees was $20,700,000. Compl. ¶ 38.

9. Although the parties' cross-motions do not seek resolution of the exact amount transferred by GE to Martin Marietta, the parties do not dispute that the total pension assets transferred by GE had a market value of at least $272,700,000 in excess of the actuarial liabilities assumed by Martin Marietta. See Pl.'s App. at 0134 (showing that GE transferred $1,169,992,000 in pension plan assets and $897,214,867 in pension plan liabilities, resulting in a transferred surplus of $272,777,133); Pl.'s App. at 0145, 0158 (Expert Report of Richard Daskais, the government's ex-

pert, valuing the assets transferred by GE at $1,169,992,000 and the actuarial liabilities transferred at $840,858,000, resulting in a transferred surplus of $329,134,000).

However, the government also asserts that, when valued using Martin Marietta's actuarial assumptions and methods, the value of the surplus in the hands of Martin Marietta was substantially less than the value of the surplus in the hands of GE. The government contends that the value of the assets transferred was $1,102,111,457 and the value of the actuarial liabilities, using Martin Marietta's assumptions, was $1,065,034,062, resulting in an actual surplus, in the hands of Martin Marietta, of $37,077,395. Def.'s Reply Br. at 17 n. 5.

PPFUF 4. Any pension assets and liabilities attributable to the GEA segment that were not transferred to the Martin Marietta plan were retained by the GEPP.[11] *Id.*

The parties initially disputed whether the sales of GEA to Martin Marietta and MAO to Westinghouse constituted segment closings under CAS 413. After the transactions were completed, at a September 8, 1995 meeting, the government requested that GE perform a segment closing adjustment calculation on the pension assets and liabilities attributable to GEA and MAO that GE retained. GE responded that it believed its transfer of pension assets and liabilities to Martin Marietta and Westinghouse had fulfilled all of its CAS 413 segment closing obligations.

On November 21, 1995, the government, through the Defense Contract Audit Agency ("DCAA"),[12]issued a draft DCAA Audit Report to GE, in which it stated that, in order to comply with the CAS, GE was required to perform a segment closing adjustment calculation on the pension assets and liabilities it retained following the sales. The government formally notified GE on September 16, 1996 through an Initial Finding of Non–Compliance of its position that, with regard to the two 1993 transactions, GE had not complied with the CAS. Compl. ¶ 46. On December 13, 1996, GE responded to the government's Initial Finding of Non–Compliance, asserting that the sales of GEA to Martin Marietta and MAO to Westinghouse effectively created new segments, and that, for the purposes of the CAS, the employees and pension assets retained by GE should not be considered in evaluating GE's compliance with the CAS.

GE argued that the obligations it retained related to the "inactive" employees meant that the portion of the segment retained by GE should not be considered closed for the purposes of the CAS. On October 27, 1997, the government issued a Determination of CAS Non–Compliance in which it asserted that GE had not complied with the CAS in connection with the two transactions because it had not submitted segment closing adjustment calculations to the government. Compl. ¶ 48.

Between 1995 and 1998, the parties engaged in negotiations regarding GE's responsibilities under the CAS. On March 31, 1998, GE officially submitted its segment closing adjustment calculations for both transactions to the Contracting Officer ("CO"). Compl. ¶ 49. Following further negotiations, on November 20, 1998, GE submitted a claim to the CO for specific adjustments based on its segment closing adjustment calculations in the amount of $539,200,000 plus interest for pension and post-retirement medical benefit costs attributable to the segments. Compl. ¶ 52. On February 24, 1999, the CO issued a Final Decision asserting a government claim against GE for noncompliance seeking $530,700,000 plus $419,400,000 in compound interest. Compl. ¶ 54. The Final Decision demanded a full cash payment from GE and provided that additional interest would continue to accrue until payment was made. *Id.* The government's claim is based on the CAS 413 segment closing adjustment calculation that the government performed on the pension assets and liabilities attributable to the

10. Similarly, in the MAO transaction, GE transferred pension assets and liabilities to Westinghouse. According to GE, it transferred $20,729,938 in pension plan assets and $13,102,202 in pension plan liabilities, resulting in a transferred surplus of $7,627,736. Pl.'s Ex. 201 at 8.

11. GE transferred approximately 40% of the GEA pension surplus to Martin Marietta and retained approximately 60% of the surplus in the GEPP. DPFUF 10; Pl.'s Ex. 201 at 8 (according to GE, the gross surplus for the GEA segment was $677,660,293, and the transferred surplus was $272,777,133, approximately 40% of the gross). In connection with the MAO sale, GE transferred approximately 51 % of the MAO pen-

sion surplus to Westinghouse and retained approximately 49% of the surplus in the GEPP. Pl.'s Ex. 201 at 8 (according to GE, the gross surplus for the MAO segment was $14,993,401, and the transferred surplus was $7,627,736, approximately 51% of the gross).

12. The DCAA was established in 1965 with the mission of performing contract audits for DOD and providing accounting and financial advisory services regarding contracts and subcontracts to all DOD components responsible for procurement and contract administration. The DCAA also provides contract audit services to other government agencies as appropriate. Defense Contract Audit Agency: About DCAA, http://www.dcaa.mil (last visited Sept. 26, 2008).

GEA and MAO employees retained by GE following the sales.

## C. The Present Litigation

As noted *supra*, this is the third decision on motions for summary judgment issued in this case. The first dispute between the parties regarded whether the sale of a segment constituted a segment closing under the original CAS 413. In *Teledyne*, 50 Fed.Cl. at 170–71, the court determined, and in *Allegheny Teledyne*, 316 F.3d at 1373–74, the Federal Circuit affirmed, that the sale of a segment by a government contractor constitutes a segment closing within the meaning of CAS 413, and thus that a contractor is required to complete a segment closing adjustment calculation, as set forth in CAS 413.50(c)(12), following the sale of a segment. In *Teledyne*, this court also held that, absent a specific contract provision to the contrary, under the original CAS the government is not entitled to recover surplus attributable to firm-fixed-price contracts and that "[t]he amount of the CAS 413 segment closing adjustment that is recoverable equals the proportion of the surplus that is attributable to government contributions under flexibly-priced contracts containing CAS 413.50(c)(12)." 50 Fed.Cl. at 191. The portion of the CAS 413 segment closing adjustment that is recoverable by the government is referred to as the government's "*Teledyne* share." The court in *Teledyne* also found that the segment closing adjustment must be implemented through the Credits clause, 48 C.F.R. § 31.205–5 (1993).[13] *Id.* at 182.

In the second decision, *General Electric Co.*, the court held that, in circumstances such as those of the GEA and MAO sales where the contractor transfers some but not all of the pension assets and liabilities as part of the segment sale, the contractor cannot avoid its obligations under CAS 413 by retaining a portion of the pension assets and liabilities and designating that portion as a separate "segment":

> CAS 413.50(c)(12) requires that the contractor undertake a segment accounting exercise to determine the pension costs attributable to the segment that is being closed pursuant to CAS 413.50(c)(5). Section 413.50(c)(5) of the CAS, in turn, requires that the contractor account for all of the funds contributed by or on behalf of the segment. This necessarily includes assets associated with both Active Employees and Inactive Employees. Nothing in CAS 413.50(c)(5) suggests that a contractor may create an Active Employees-only segment and ignore the funds contributed to or on behalf of the segment for Inactive Employees. *GE had "complete" segments that made up GE Aerospace. It cannot carve out from those complete segments a new "incomplete" segment of Active Employees only.* . . . The focus of CAS 413.50(c)(12) is on individual segments. Here, the business units, or "segments," making up GE Aerospace stopped performing government contracts when the units were sold to MMC. The time to settle-up with the government for any surplus or deficit attributable to government

13. In *Teledyne*, the court explained:
   Because the court concludes that the CAS 413 segment closing adjustment allows for recovery in the current period at the time of the segment closing, the terms of the Allowable Cost and Payment and Credits clauses will govern. "As a general proposition, . . . cost principles are concerned with assuring that if the Government pays a cost and later that cost is reduced, by whatever means, the Government receives the benefit of that reduction." Under the Allowable Cost and Payment clause, if the CAS 413 calculation shows a surplus, the contractor will be required "to pay to the Government any refunds, rebates, credits, or other amounts . . . accruing to or received by the Contractor . . . to the extent that they are properly allocable to costs for which the Contractor

has been reimbursed by the Government." 48 C.F.R. § 52.216–7(h)(2). The provision is then implemented through the Credits clause, which states that, *"The applicable portion of any income, rebate, allowance, or other credit relating to any allowable cost and received by or accruing to the contractor shall be credited to the Government either as a cost reduction or by cash refund." Id.* § 31.201–5. In the case of a pension deficit identified as a result of the CAS 413 segment closing adjustment, the contractor will be able to claim the additional pension costs as allowable costs at the time of final contract close out.
50 Fed. Cl. at 182 (internal citations omitted) (emphasis added). *See also Allegheny Teledyne,* 316 F.3d at 1370 n. 3, 4.

contributions relating to the closed units is at the time of the segment closing.

60 Fed.Cl. at 796 (emphasis added). The court rejected GE's contention that it had satisfied its obligations under the CAS according to the plain language of the GE Advance Agreement by transferring pension assets and liabilities for the active employees to Martin Marietta as part of the transaction, *id.* at 792–93, and the court determined that GE could not avoid performing a CAS 413 segment closing adjustment calculation by retaining the pension assets and liabilities attributable to retired and former GE employees who were not transferred to the buyers and classifying the retained assets and liabilities as a separate segment. *Id.* at 796. The court concluded that because the segment was sold and was no longer performing government contracts, GE was required to perform a segment closing adjustment calculation at the time of the sale, or segment closing. *Id.* Accordingly, the court determined that GE was required to undertake a final segment closing adjustment calculation for the *entire* segment to appropriately account for all of the segment's pension assets and liabilities, including the pension assets and liabilities attributable to inactive employees associated with the closed segment. *Id.* at 799. Following the *General Electric Co.* decision the parties engaged in extensive discovery. At the close of that discovery, the parties filed the instant motions.

In the motions currently before the court, GE contends that its transfers of pension surplus to MMC and Westinghouse satisfied any segment closing adjustment obligation GE owed to the government pursuant to CAS 413.50(c)(12). Specifically, GE asserts that, under the original CAS, any segment closing adjustment calculation must be made on a segment-wide basis, and that GE's pension surplus transfer of an amount greater than its segment closing adjustment obligation benefitted the government in the same way as would have a direct cash payment to the government of its segment closing adjustment obligation. Accordingly, GE contends that the full amount of the pension surplus it transferred to MMC and Westinghouse should be considered in determining whether GE satisfied its CAS 413 segment closing obligation to the government.

The government filed a cross-motion for partial summary judgment, arguing that, under the original CAS 413.50(c)(12), because GE transferred a portion of its pension assets and liabilities to Martin Marietta, GE was required to perform a segment closing adjustment calculation, at minimum, on the portion of the pension assets and liabilities it retained. The government asserts, however, that if the court were to adopt GE's contention that the segment closing adjustment calculation must be performed on the entire segment, then GE must satisfy its resulting segment closing adjustment obligation through a direct cash payment to the government, without any consideration given to the portion of the pension assets and liabilities that GE transferred to Martin Marietta and Westinghouse in connection with the sales.

As noted above, Unisys filed a motion for partial summary judgment, and the government filed a cross-motion for partial summary judgment, raising similar issues.[14] In

14. Because the court has considered the arguments of Unisys in deciding the present case, a brief summary of the facts of *Unisys* follows. Unisys has performed government contracts for many years through business units organized in its Government Systems Group ("GSG"). On March 20, 1995, Unisys entered into a contract to sell certain GSG divisions, called collectively the Defense System Organization ("DSO"), to Loral Corporation ("Loral"). Specifically, the sale included four GSG segments located in New York, Utah, Minnesota, and Alabama. The sale was completed on May 4, 1995. The GSG divisions that were not sold were retained by Unisys.

Effective May 5, 1995, Unisys, Loral, and the government entered into a Novation Agreement

in connection with the sale of DSO, pursuant to which Loral "assumed all obligations and liabilities of [Unisys] under the contracts" and became the "successor in interest in and to the contracts" that were part of the sale. Unisys Ex. 4 at 2. Effective May 5, 1995, Unisys, Loral, and the government also entered into an Advance Agreement, pursuant to which Loral agreed to "maintain segmented pension plan accounting for the employees of the [DSO] unless it adopt[ed] a change in cost accounting practices as provided by regulation." *Id.* at 13.

At the time of the sale, the Unisys pension plan contained a surplus of approximately $76,000,000. In connection with the sale of DSO to Loral, Unisys transferred all of the pension liabilities associated with active DSO em-

its motion, Unisys argues that its transfer of pension surplus to Loral in connection with the sale of four of its business units to Loral satisfied its segment closing adjustment obligations under CAS 413. However, Unisys also contends that, even assuming the transfer of pension surplus did not satisfy its CAS 413 segment closing adjustment obligations, the damages owed due its noncompliance with the CAS should be determined by calculating the difference between the benefit that the government received from the pension surplus transfer in the form of reduced future pension costs and the benefit that the government would have received had Unisys paid the segment closing adjustment directly to the government as a cash payment. Unisys argues that under 41 U.S.C.

§ 422(h)(1)(B) (1993), 48 C.F.R. §§ 9903.201–4(a), 9903–306(a), (e) (1993), and FAR 52.230–2(a)(5) (1993), the appropriate measure for damages for CAS noncompliance is the "increased costs" paid by the government as a result of the noncompliance.[15]

DIRECTV filed briefs as amicus curiae on September 21, 2007 in both *GE* and *Unisys*.[16] In its briefs, DIRECTV agrees with the positions of GE and Unisys that a contractor is entitled to full credit for pension surplus transferred to successor contractors in determining whether the contractor satisfied its segment closing adjustment obligation under CAS 413.50. DIRECTV further contends that, in its case, the government actually and tangibly benefitted from the pension surpluses that

---

ployees and pension assets equal to those liabilities. Unisys also transferred approximately $27,000,000 in additional pension assets, retaining approximately $49,000,000 of the pension surplus.

15. 41 U.S.C. § 422(h)(1)(B) provides that all contractors, as a condition of contracting with the United States, must "agree to a contract price adjustment, with interest, for any increased costs paid to such contractor or subcontractor by the United States by reason of ... a failure by the contractor or subcontractor to comply with applicable cost accounting standards." 48 C.F.R. § 9903.306(e) provides that, even if the failure of a contractor to follow the CAS is estimated to result in increased costs to the government under a particular contract, "the Government will not require price adjustment for any increased costs paid by the United States, so long as the cost decreases under one or more contracts are at least equal to the increased cost under the other affected contracts...." FAR 52.230–2(a)(5) provides that, if a cost adjustment is made, "[i]n no case shall the Government recover costs greater than the increased cost to the Government, in the aggregate, on the relevant contracts subject to the price adjustment...."

Unisys asserts that, under these provisions, even assuming its decision to transfer pension surplus to Loral did not satisfy its segment closing adjustment obligation under CAS 413, it should not be responsible for any additional payments to the government because, Unisys contends, the government did not incur "increased costs" as a result of the sale and resulting transfer of pension assets and liabilities. Instead, Unisys asserts that the government actually paid lower costs due to the benefits the government received from the pension surplus transfer in the hands of Loral.

16. DIRECTV's complaint involves transactions similar to those at issue in both GE and *Unisys*.

In 1997 and 2000, DIRECTV sold the majority of its government contracts business through two major transactions. Effective December 17, 1997, DIRECTV sold its defense segment to Raytheon Company ("Raytheon"), and Raytheon assumed responsibility for performance of the segment's government contracts. Br. Amicus Curiae at 5. Effective October 6, 2000, DIRECTV sold its satellite segment to The Boeing Company ("Boeing"), and Boeing assumed responsibility for performance of the segment's government contracts. *Id.* DIRECTV asserts that, in conjunction with the Raytheon transaction, it transferred all of the pension assets and liabilities pertaining to the defense segment to Raytheon, including surplus assets of $2,460,000,000. *Id.* at 6. DIRECTV also asserts that, in conjunction with the Boeing transaction, it transferred all of the pension assets and liabilities pertaining to the satellite segment to Boeing, including surplus assets of $803,000,000. *Id.* Although the Raytheon and Boeing transactions occurred after the 1995 Amendments to CAS 413, as a result of the pension surplus in DIRECTV's pension plan, no pension costs had been charged to the government for many years at the time of the Amendments, and all of the government's contributions to the Raytheon and Boeing pension plans were made before the Amendments. *Id.* at 7.

On July 25, 2008, DIRECTV and the government filed a stipulation of the facts particular to the Boeing and Raytheon transactions. The parties agree, for the purposes of resolving the surplus transfer issue in DIRECTV, on the market value of the pension assets and liabilities allocable to both segments at the time of the sales, the amount of assets and liabilities transferred to Boeing and Raytheon in connection with the sales, and the government's *Teledyne* share of each segment's pension assets and liabilities at the time of the sales.

DIRECTV transferred to Raytheon and Boeing, the two entities to which DIRECTV sold business units performing government contracts, and that the government's position that a contractor should receive no credit for pension surplus transferred to an acquiring company would result in a windfall to the government, contrary to the language of 41 U.S.C. § 422(h)(3) (1993), which provides that the government may not recover "costs greater than the increased cost ... to the Government, in the aggregate, on the relevant contracts subject to the price adjustment."

Oral argument was heard on August 25, 2008.[17]

## DISCUSSION

### A. Standard of Review

#### 1. Summary Judgment

The parties have filed cross-motions for partial summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. 2505.

In determining whether a genuine issue of material fact exists, the court must consider the evidence and resolve all doubts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Am. Pelagic Fishing Co. v. United States,* 379 F.3d 1363, 1371 (Fed.Cir.2004). A dispute of material fact is genuine "if the evidence is such that a

reasonable finder of fact could return a verdict for the nonmoving party." *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. Cross-motions for summary judgment do not constitute an admission that no genuine issues of material fact remain. *See Massey v. Del Labs., Inc.,* 118 F.3d 1568, 1573 (Fed.Cir. 1997). "Each party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts." *Id.* (citations omitted).

#### 2. Interpretation of the CAS

The standard of review for a motion for summary judgment premised on the proper interpretation of a statute or regulation is well-settled. Here, the primary dispute concerns the proper interpretation of the original CAS 413.50(c)(12), which is a question of law. *See Rumsfeld v. United Techs. Corp.,* 315 F.3d 1361, 1369 (Fed.Cir.2003) ("[T]he interpretation of CAS [ ] is an issue of law, not an issue of fact, as we have made clear in our prior decisions."); *Billings v. United States,* 322 F.3d 1328, 1332 (Fed.Cir.2003) ("The underlying issue, one of statutory and regulatory construction, is a question of law...."). Where, as here, all of the parties' factual assertions are taken as true, summary judgment on the legal issue is appropriate. *See, e.g., Santa Fe Pac. R. Co. v. United States,* 294 F.3d 1336, 1340 (Fed.Cir. 2002) ("Issues of statutory interpretation and other matters of law may be decided on motion for summary judgment."); *Costain Coal, Inc. v. United States,* 126 F.3d 1437, 1440 (Fed.Cir.1997).

In evaluating the meaning of the original CAS 413.50(c)(12), the Federal Circuit has held that the court must be guided by the CASB's intent in promulgating the standard. *Perry v. Martin Marietta Corp.,* 47 F.3d 1134, 1137 (Fed.Cir.1995) ("our task in interpreting the meaning of these ... provisions is ultimately to ascertain the CASB's intended meaning when it promulgated the CAS" (citing *Riverside Research Inst. v. United States,* 860 F.2d 420, 422 (Fed.Cir.1988))). The Federal Circuit explained in *Allegheny Teledyne,*

17. Counsel for Unisys and DIRECTV also partici-        pated in the August 25, 2008 oral argument.

When interpreting provisions of the CAS our task is "to ascertain the CASB's intended meaning when it promulgated the CAS." We accomplish this first by looking at the text of the relevant provisions and "any guidance that the CASB has published to aid in interpretation." We examine the issues ... through this interpretive lens.

316 F.3d at 1373 (quoting *Perry,* 47 F.3d at 1137). Thus, the court must "first look to the authority of the CASB, the regulatory framework within which CAS 413 operates, its plain language, and its regulatory history to determine the proper meaning of the original and amended CAS 413.50(c)(12)." *Teledyne,* 50 Fed.Cl. at 161–62.

### B. CAS 413 Requires a Segment Closing Adjustment Calculation to Be Performed on the Entire Segment, Including the Portion of the Pension Assets and Liabilities That Were Transferred to the Buyer.

The parties do not dispute that CAS 413 required GE to undertake a segment closing adjustment calculation as a result of the sale of GEA to Martin Marietta and MAO to Westinghouse. Rather, they disagree as to what pension assets and liabilities should be included in the segment closing adjustment calculation. The plaintiffs contend that the segment closing adjustment calculation should be performed on the pension assets and liabilities attributable to the *entire* segment, including those portions of the pension assets and liabilities transferred to the buyers. The government's primary contention is that the segment closing adjustment calculation should be performed only on the portion of the pension assets and liabilities remaining with the seller.

GE, Unisys, and DIRECTV contend that the segment closing adjustment calculation must be made on the segment as a whole, based on the plain language of the CAS, which speaks only of "segments" and does not mention partial pension surplus transfers, and the new CAS, which the plaintiffs allege established a new rule for segment closing adjustment calculations in the event of a partial pension surplus transfer. Based on this court's prior holding in *General Electric Co.* rejecting GE's initial assertion that the CAS permitted GE to create and maintain an open partial segment of the non-transferred "inactive" employees at the time of the sale, 60 Fed.Cl. at 796, the plaintiffs also contend that the CAS 413 segment closing adjustment calculation must be performed on the segment as a whole.

The government argues, in response, that because the plaintiffs transferred only some but not all of the pension assets and liabilities to the buyer, the plaintiffs should be required to perform the segment closing adjustment calculation on only the portion of the pension assets and liabilities that the plaintiffs retained following the segment sales. In any event, the government argues that if the court were to adopt GE's contention that the segment closing adjustment calculation must be performed on the entire segment, then GE must satisfy its resulting segment closing adjustment obligation through a direct cash payment to the government, without any consideration given to the portion of the pension assets and liabilities that GE transferred to Martin Marietta and Westinghouse in connection with the sales.[18]

In support of its contentions, the government asserts that the original CASB's intent can be gleaned from the new CAS, which, as noted above, now requires a contractor that transfers a portion of its pension assets and liabilities in connection with the sale of a segment to perform a segment closing adjustment calculation only on the pension assets and liabilities that the contractor retains. The government also argues that its interpretation of the original CAS does not conflict with the plain language of the CAS but is instead consistent with the earlier *Teledyne* decisions, in which this court and the Federal Circuit recognized that not all portions of a pension surplus are subject to a

---

18. In other words, the government argues that whether the segment closing adjustment calculation is made on only the retained assets and liabilities or on the assets and liabilities for the entire segment, under the CAS, GE alone must be responsible for the payment of that obligation. The government suggests, therefore, that its reading of the CAS is more generous to the plaintiffs.

final CAS 413 segment closing adjustment.[19] Here, the government argues that any potential value of the transferred pension assets and liabilities should not be included in the segment closing adjustment calculation, because, according to the government, the government has no control over the pension surplus in the hands of the buyer and therefore the government is not guaranteed any benefit from the transfer.

The plaintiffs argue in response that the new CAS is a significant departure from the original CAS, and therefore it does not provide any helpful or authoritative guidance to the court in interpreting the original CAS. The plaintiffs further argue that the government's concerns regarding the fate of the transferred surplus in the hands of the buyer are unfounded, contending that CAS 413.50(c)(3) protects the government's share of the transferred surplus in the hands of the buyer and requires that the pension surplus be used to the government's benefit.

The court agrees with the plaintiffs that the plain language of the original CAS requires that the segment closing adjustment calculation be performed on the entire segment and that the government's arguments to the contrary are unsubstantiated. The purpose of the segment closing adjustment is "to correct for the government's past over or under contribution to the closed segment's pension costs." *Viacom, Inc. v. United States,* 70 Fed.Cl. 649, 659 (2006); *see also Teledyne,* 50 Fed.Cl. at 181 ("the purpose of the CAS 413 segment closing provision is to look back and determine whether the government over contributed or under contributed to the segment's pension plan"). Specifically, the purpose of the CAS 413 adjustment is to correct, or adjust, for the government's over– or under-contribution of pension costs attributable to flexibly-priced government contracts performed by the *entire segment.* The segment closing adjustment provision of CAS 413 repeats the word "segment" nine times:

> If a *segment* is closed, the contractor shall determine the difference between the actuarial liability for the *segment* and the market value of the assets allocated to the *segment,* irrespective of whether or not the pension plan is terminated.... In computing the market value of assets for the *segment,* if the contractor has not already allocated assets to the *segment,* such an allocation shall be made in accordance with the requirements of paragraph (c)(5)(i) and (ii) of this section. The market value of the assets allocated to the *segment* shall be the *segment's* proportionate share of the total market value of the assets of the pension fund. The calculation of the difference between the market value of the assets and the actuarial liability shall be made as of the date of the event (e.g., contract termination) that caused the closing of the *segment* .... The difference between the market value of the assets and the actuarial liability for the *segment* represents an adjustment of previously-determined pension costs.

42 Fed.Reg. at 37,198 (emphasis added). Thus, by its plain terms CAS 413 requires that the segment closing adjustment calculation include the pension costs paid by the government to the entire "segment."

In addition, this court has previously held in this case that CAS 413.50(c)(12) required the segment closing adjustment calculation to be performed on the *entire* "segment" as defined by the CAS.[20] *See Gen. Elec. Co.,* 60 Fed.Cl. at 795 ("While it is true that contractors have discretion in establishing segments, the definition of segment in the CAS precludes a contractor from excluding employ-

---

19. For example, the court in *Teledyne* determined that the pension assets and liabilities attributable to fixed price government contracts are not subject to the adjustment. 50 Fed.Cl. at 178. Similarly, the *Teledyne* court also found that employee contributions should be excluded from the segment closing adjustment calculation because they were not paid by the government and therefore are not costs for which the government is entitled to reimbursement. *Id.* at 183–84.

20. The original CAS defined a "segment" as: "One of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office, usually identified with responsibility for profit and/or producing a product or service." 42 Fed.Reg. at 37,196–197.

ees who are associated with a segment from that segment . . . ."), 796 (holding that a party "cannot carve out from those complete segments a new 'incomplete' segment"). The government's arguments to the contrary ignore both this holding and the plain language of the original CAS 413.50.

Further, the government's assertion that this court's and the Federal Circuit's *Teledyne* decisions allow for a segment closing adjustment calculation on less than the entire segment is not correct. It is true that the *Teledyne* decisions recognized that no adjustment calculation can be performed on previously determined pension costs attributable to certain pension contributions, such as employee contributions, 50 Fed.Cl. at 183–84, or certain contracts, such as fixed price contracts, *id.* at 172–78. However, these rulings are based on the fact that certain costs do not require a cost adjustment to account for past over-contributions by the government. For example, employee contributions are not government contributions and therefore have no basis for any adjustment for the benefit of the government. *Id.* at 183–84. Similarly, fixed price contracts are excluded from the segment closing adjustment calculation because the original CAS did not allow for an adjustment to pension costs that were fixed because they were paid by the government under fixed price contracts. *Id.* at 178. Here, by contrast, the plaintiffs seek to include in the segment closing adjustment calculation, consistent with *Allegheny Teledyne* and *Teledyne*, only those portions of the transferred pension costs that are subject to adjustment. The plaintiffs seek an adjustment of only the *Teledyne* share, i.e., pension costs attributable to flexibly priced government contracts performed by the segment as a whole.

■ The court further agrees with the plaintiffs that the government's reliance on the language of the new CAS 413.50(c)(12)(v) to support its interpretation of the original CAS 413.50(c)(12) is misplaced. Prior decisions by the Federal Circuit and by this

court have made clear that where the changes to CAS 413 implemented through the 1995 Amendments were substantive and without precedent in the original CAS, any new requirements cannot be viewed as merely a clarification of what was required under the original CAS 413. *See, e.g., Allegheny Teledyne*, 316 F.3d at 1379–80 ("[I]t is illogical to say all the additional text of the amendment simply 'clarified' rights that already existed, especially in light of the several clear changes made to the segment closing provision."); *Teledyne*, 50 Fed.Cl. at 176 (rejecting GM's reliance on the language of the new CAS to support its interpretation of the requirements under the original CAS). Such is the case here. The length and detail of the new subsection (v) clearly indicate a change to, and not simply a clarification of, the original CAS 413.50(c)(12). More specifically, the new CAS's requirement that, in the event of a partial surplus transfer, a segment closing adjustment calculation be performed on "the pension plan assets and actuarial accrued liabilities *remaining with the contractor,*" 60 Fed.Reg. at 16,552 (emphasis added), is on its face a change from the original CAS's requirement that a segment closing adjustment calculation be performed on "the assets and actuarial liability *for the segment.*" 42 Fed.Reg. at 37,196 (emphasis added). Indeed, as the plaintiffs note and the government concedes, the original CAS and the accompanying prefatory comments make no reference to partial pension surplus transfers. The concept of a partial surplus transfer was first introduced to the CAS with the 1995 Amendments. Given the Federal Circuit's clear holding that, for purposes of interpreting the original CAS, a change implemented through the new CAS cannot, in the absence of evidence to the contrary, be considered to merely clarify the CASB's intent in promulgating the original CAS, *Allegheny Teledyne*, 316 F.3d at 1379–80, the government's argument must fail.[21] Therefore, the original CAS cannot be read to encompass the provisions of the new CAS, and the language of the new CAS

---

21. In *General Motors Corp. v. United States*, 78 Fed.Cl. 336, 347 (2007), this court relied in part on the new CAS to interpret the CASB's intended meaning of the original CAS. However, the court accepted the government's argument that the new CAS should aid the court's interpretation

only because there was "nothing in the record that indicate[d] that, at the time of the promulgation of revised CAS 413, the 1995 [CASB], the government, or the contracting community" believed that the revisions constituted a substantive change. *Id.* at 349. The court, in considering

413.50(c)(12)(v) cannot be retroactively applied in interpreting the segment closing adjustment requirements of the original CAS.

█ Finally, both parties have conflated the issue of whether the segment closing adjustment *calculation* must be performed on the entire segment with the issue of whether the transfer of a pension surplus by the plaintiffs can, in any way, be counted towards satisfaction of the plaintiffs' segment closing adjustment *obligations.* The plaintiffs have asserted that the dollar value of the transferred pension surplus should be directly incorporated into the segment closing adjustment calculation itself and should automatically offset the plaintiffs' segment closing adjustment obligations, while the government contends that the transferred pension surplus should not be considered either in the segment closing adjustment calculation or in determining whether the plaintiffs have satisfied their segment closing adjustment obligations because the government could never obtain the full dollar value of the transferred surplus from the buyers and could not feasibly track the value to the government of the pension surplus in the hands of the buyer. The parties' arguments regarding the value of the transferred pension assets and liabilities to the government in the hands of the buyer are not relevant to the question of whether the pension assets and liabilities transferred to the buyers should be included in the segment closing adjustment calculations in the first instance. The original CAS requires that the pension assets and liabilities attributable to *the entire segment* be included in the segment closing adjustment *calculation* that the seller is required to perform *at the time of the segment closing.* Whether the value of any transferred pension assets and liabilities in the hands of the buyer can be counted to satisfy the seller's segment closing payment *obligation* is an entirely separate question. In the next section, the court will address the question of whether any benefit derived from the transferred pension assets and liabilities in the hands of the buyer can be considered in determining whether the seller has met its CAS 413 segment closing obligations. For the reasons set forth above, the court first finds that the segment closing adjustment calculation required by the original CAS 413 must include the pension assets and liabilities, including any surplus, transferred to the buyer in connection with the sale of a segment.

**C. The Government Must Consider the Benefits it Obtains from the Transferred Pension Surplus in Determining the Seller's Compliance with Its CAS 413 Segment Closing Payment Obligation.**

**1. The Parties' Positions**

█ GE's primary assertion in its motion is that the full amounts of pension surplus it

the new CAS, relied on several Supreme Court decisions for the proposition that "[s]ubsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction." *Red Lion Broad. Co. v. Fed. Commc'ns. Comm'n.,* 395 U.S. 367, 380–81, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *see also Andrus v. Shell Oil Co.,* 446 U.S. 657, 666 n. 8, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980); *Fed. Hous. Admin. v. Darlington, Inc.,* 358 U.S. 84, 90, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958). However, the Supreme Court has also cautioned that "arguments predicated upon subsequent congressional actions must be weighed with extreme care," *Andrus,* 446 U.S. at 666 n. 8, 100 S.Ct. 1932, and that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 117, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980) (citing *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960)).

The *General Motors* court's consideration of the language of the new CAS to understand the intent of the original CASB was appropriate in the unique circumstances of *General Motors* in which no member of the contracting community, nor the CASB itself, recognized that the new CAS 413.50(c)(12)(i) constituted a change in the actuarial assumption requirements related to the segment closing adjustment, and the 1995 CASB's comments noted the new subsection's consistency with the purpose of the original CAS. In the instant case, nothing in the 1995 CASB's comments indicates that the CASB felt the addition of subsection (v) constituted anything other than a change to the segment closing adjustment requirements. The new subsection addressed a situation that was not at all contemplated by the original CAS and added an entirely new element to the mechanism of the segment closing adjustment calculation. Accordingly, the language of the new subsection (v) may not be relied upon to infer the intent of the original CASB in promulgating the original CAS 413.50(c)(12).

transferred to MMC and Westinghouse in connection with the sales of GEA and MAO must automatically count towards satisfaction of its CAS 413 segment closing adjustment obligations. Unisys and DIRECTV make the same assertion with regard to the sales of their segments. More specifically, GE argues that the government could obtain the full benefit of its *Teledyne* share of the segment's pension assets through reductions in future pension costs the government would owe the buyers. GE asserts that this result is compelled by the language of the CAS authorizing legislation, 41 U.S.C. § 422 (1993), which provides that the government may not recover "costs greater than the increased cost ... to the Government, in the aggregate, on the relevant contracts subject to the price adjustment." 41 U.S.C. § 422(h)(3). GE contends that various provisions in the original CAS, including CAS 413.50(c)(3), require the segment buyer to dedicate the transferred surplus pension assets to its government contracts, and therefore that the government will obtain the benefit of GE's segment closing adjustment obligation in the form of reduced future pension costs from the buyer. GE further argues that its view has been endorsed by the government in implementing guidance from the Department of Defense ("DOD"), in which the DOD Inspector General ("IG") and the Defense Logistics Agency ("DLA")[22] have provided that a contractor's CAS 413 segment closing adjustment obligation can be satisfied through the transfer of a pension surplus to the segment buyer. This guidance includes The Working Draft of the Handbook on Pension Issues in Defense Contracting, issued by the DOD IG in 1993 ("DOD Guidance"),[23] and a 1988 letter from the DLA to a government contractor, Gould, Inc., regarding Gould's compliance with CAS 413.50(c)(12) in connection with its sale of business segments performing government contracts. Pl.'s Ex. 121 (tab 16).

Unisys and DIRECTV endorse GE's arguments.

In addition, the plaintiffs contend that under the Credits clause, which provides the means for implementing the CAS 413 segment closing adjustment, *see Allegheny Teledyne,* 316 F.3d at 1370; *Teledyne,* 50 Fed.Cl. at 182, the plaintiffs' segment closing adjustment obligations are satisfied in full as long as the government receives a cost reduction from the buyer equal to or greater than the amount of any cash refund it would have otherwise received from the seller under the clause. The plaintiffs argue that to require the CAS 413 adjustment to come only directly from the seller, without regard to any benefits the government obtains through decreased costs from the buyer, would give the government a windfall contrary to the CASB's intentions.

The government, in response, asserts that CAS 413 requires the segment closing adjustment obligation to be satisfied through a direct cash payment to the government under the Credits clause and that the amount of pension surplus transferred by the plaintiffs to the buyers should not be considered in determining whether the plaintiffs satisfied their segment closing adjustment obligations. The government argues that allowing the value of the transferred pension surplus to substitute for a direct cash payment to the government does not meet the goal of the CAS 413 segment closing adjustment requirement, which is to compensate the government for its past over-contributions to the seller's pension plan. The government further argues that the buyer cannot dedicate the pension assets and liabilities transferred to the buyer for the full benefit of the government in the manner the plaintiffs assert and that the government will therefore never receive the same benefit from the transferred surplus that it would from a direct cash payment.[24] Moreover, the government

22. The DLA is "responsible for reviewing contractor pension costs with audit assistance from the DCAA." Pl.'s Ex. 125 at 6.

23. This Handbook sets forth its purpose as "illustrat[ing] the effect of strategic business decisions on pension costs charged to the Government and explain[ing] the princip[al] Government guide-

lines that contractors have to comply with." Pl.'s Ex. 125 at I.

24. Instead, the government argues that the CAS, in particular CAS 418.40(c), would actually prohibit the buyer from allocating the transferred surplus specifically to the buyer's flexibly priced government contracts. CAS 418.40(c) requires

**146**

asserts that the segment closing adjustment is inherently retrospective and is required as a means to adjust for differences between *past projections* of a pension's future performance and the pension's actual performance. Because of its retrospective nature, the government asserts that the CASB could not have intended for the CAS 413 segment closing adjustment to consider, at the time the segment closing adjustment calculation is performed, the future benefits the government might obtain from a transferred pension surplus.

The government argues that the plaintiffs' reliance on DOD guidance to the contrary is misplaced. The government contends that the CASB's intent is the only relevant consideration in determining whether the contractors can meet their CAS 413 adjustment obligations through a pension surplus transfer. The government further contends that, regardless of the amount of pension surplus transferred by the seller to the buyer, if an adjustment calculation is not performed on

the seller's retained portion only, the seller will receive a windfall, in that the seller will continue to benefit from the retained surplus in the form of reduced future pension costs, but the government will never be appropriately compensated for any over-contributions for which it reimbursed the sellers because there are no future accounting periods in which an adjustment could be made on behalf of the government.[25]

While the government agrees that its recovery is based on the Credits clause, the government argues that the plaintiffs cannot count any of the transferred pension surplus towards satisfying their segment closing adjustment obligations, because the Credits clause does not contemplate cost reductions from third parties. According to the government, the seller must pay the full amount of the segment closing adjustment obligation to the government in cash. The government asserts that any benefits it has derived from the surplus transfers were incidental to its dealings with the plaintiffs.[26]

that costs "be allocated to cost objectives in reasonable proportion to the beneficial or causal relationship of the pooled costs to cost objectives...." 45 Fed.Reg. 31,929, 31,932 (May 15, 1980). The government asserts that an allocation by the buyer of its pension surplus only to flexibly priced government contracts would violate these requirements because annual pension costs, including those accounting for any transferred surplus, bear the same beneficial or causal relationship to all final cost objectives, not just to flexibly priced cost objectives.

In response, GE asserts that, because CAS 418 deals with the general circumstances of annual accounting, it cannot be used to limit the operation of CAS 413. GE also argues that, under the "beneficial or causal relationship" test set forth in CAS 418.40(c), the allocation of transferred surplus only to those contracts under which the government would receive a benefit from the surplus would be entirely appropriate. Finally, GE contends that CAS 418.50(f) allows the government and a contractor to "agree to a special allocation" in the event that a particular cost objective "receives significantly more or less benefit from an indirect cost pool than would be reflected by the allocation of such costs." 45 Fed.Reg. at 31,933–34.

As discussed further infra, this decision does not reach the issue of whether the buyers actually did allow the government to derive a benefit from the transferred surpluses or whether any benefit the government derived from the pension surpluses transferred by the plaintiffs can be quantified. Accordingly, the parties' assertions regarding whether CAS 418 allows a buyer to, or

prohibits a buyer from, allocating transferred pension surplus specifically to government contracts are premature and are thus not considered by the court at this time.

25. For this reason, the government contends that only the transfer of the full amount of a segment's pension surplus in connection with the sale of a segment would satisfy the seller's segment closing adjustment obligations under CAS 413, because future accounting periods would exist within which adjustments could be made for the entire segment.

26. The government maintains that it was not involved in the plaintiffs' decision to transfer excess pension assets and liabilities to the buyers and neither approved the transfers nor assented to the transfers serving to satisfy the plaintiffs' segment closing obligations, and that the government was not required, under the CAS, to monitor and track its share of any transferred surplus in the hands of the buyer. However, this claim is belied by the fact that the government entered into a number of agreements, as detailed above, in connection with the transaction to protect its interests. For example, the government and Martin Marietta entered into a Novation Agreement providing that the government would not be

obligated to pay or reimburse either [GE or Martin Marietta] for, or otherwise give effect to, any costs, taxes, or other expenses, or any related increases, directly or indirectly arising

### 2. The Parties Do Not Dispute that the Government Will Derive Some Benefit from the Transferred Pension Assets and Liabilities.

It is beyond dispute that the government will receive a benefit from the excess pension assets and liabilities transferred by the plaintiffs to the buyers. The plaintiffs contend that the government will receive a benefit equal to the cash value of the pension assets and liabilities at the time of the transfer. The government disputes this contention, but concedes that the government would benefit in some form from the pension surplus transfers. For example, in its opening brief, the government states that, when a contractor transfers pension surplus to a buyer, the presence of the transferred surplus can "have the effect of reducing the amount of pension cost that the buyer charges to the Government with respect to the closed segment's transferred contracts." Def.'s Mot. Summ. J. at 15; *see also id.* at 20 n. 7 ("The transferred surplus will reduce further pension cost calculated under CAS 412 by reducing the plan's unfunded actuarial liability."); Def.'s Reply Br. at 2–3 ("When a contractor transfers pension assets greater than the transferred actuarial liabilities to the buyer, along with the segment's contracts, those assets are integrated into the buyer's pension fund where they factor into future periods' pension cost calculations, lowering the pension cost below what it would be absent the transfer.").

While the exact amount of the benefit that the government received from the pension assets and liabilities transferred to the buyers by the plaintiffs is in dispute in these motions, as discussed *infra* the court does not reach this dispute at this time. So long as the buyers have some duty to allocate the government's share of the transferred pension surplus for the benefit of the government, the amount of benefit the government in fact receives must be considered in determining the plaintiffs' compliance with their payment obligation. The provisions upon which the plaintiffs rely, including CAS 413.50(c)(3) [27] and Prefatory Comment No. 14(b) to the original CAS,[28] demonstrate that the CAS protects at least a portion of the government's share of the transferred surplus from dilution in the hands of the buyer. While the amount of the benefit may be in dispute, the fact that there is a benefit is not. Accordingly, the fact that the government may not derive the entire value of the surplus in the form of a cost reduction from the buyer, a matter that will be addressed in the next phase of this litigation, does not mean that the benefit must not be considered in determining whether the plaintiffs have satisfied their segment closing adjustment obligations.

### 3. The CAS, the CAS Authorizing Legislation, and Other Government Guidance All Provide that the Government Cannot Receive a Windfall from the Segment Closing Adjustment.

The court finds that the government must give a seller a credit towards its segment

out of or resulting from the transfer or this Agreement, other than those that the Government in the absence of this transfer or Agreement would have been obligated to pay or reimburse under the terms of the contracts. Pl.'s App. at 0067 (tab 7). The government asserts that the various agreements into which it entered, including the Novation Agreement, protected the government from paying increased costs, but did not specifically require the buyers to protect the government's interest in the transferred surpluses by applying the surpluses exclusively towards reducing future government pension costs.

**27.** CAS 413.50(c)(3) provides in full:

Pension cost shall also be separately calculated for a segment under circumstances where (i)

The pension plan for that segment becomes merged with that of another segment, and (ii) The ratios of assets to actuarial liabilities for each of the merged plans are materially different from one another after applying the benefits in effect after the merger.

42 Fed.Reg. at 37,197.

**28.** Prefatory Comment No. 14(b) provides that, in a situation in which the pension fund of a contractor that acquired a commercial subsidiary is in a surplus position, so that pension contributions are not being made for either the government segments or the commercial subsidiary, CAS 413.50(c)(3) protects "the government's proportional share of the surplus" from being "diluted by the annual pension plan costs of the commercial subsidiary." 42 Fed.Reg. at 37,196.

closing adjustment obligations for the value of the benefit the government receives from the transfer of excess pension assets and liabilities to the buyer. This result is compelled for several reasons. First, the language of the CAS authorizing legislation makes clear that the CAS protect the government from paying increased costs as a result of segment closing adjustment but prohibit the government from receiving a windfall. *See, e.g.,* 41 U.S.C. §§ 422(h)(1)(B), 422(h)(3). 41 U.S.C. § 422(h)(1)(B) provides that contractors, as a condition of contracting with the government, shall "agree to a contract price adjustment, with interest, for any *increased costs* paid to such contractor or subcontractor by the United States by reason of a change in the contractor's or subcontractor's cost accounting practices or by reason of a failure by the contractor or subcontractor to comply with applicable cost accounting standards." (Emphasis added). 41 U.S.C. § 422(h)(3) provides, in turn:

> Any contract price adjustment undertaken pursuant to [41 U.S.C. § 422(h)(1)(B)] shall be made, where applicable, on relevant contracts between the United States and the contractor that are subject to the cost accounting standards so as to protect the United States from payment, in the aggregate, of increased costs.... *In no case shall the Government recover costs greater than the increased cost ... to the Government, in the aggregate,* on the relevant contracts subject to the price adjustment, unless the contractor made a change in its cost accounting practices of which it was aware or should have been aware at the time of the price negotiation and which it failed to disclose to the Government.

(Emphasis added). These provisions support the plaintiffs' contention that if the government receives a benefit in the form of reduced future pension costs from the transferred pension surplus, the government must ultimately consider that benefit in determining whether the plaintiffs have satisfied their segment closing adjustment obligations under CAS 413.50. *See id.; see also* 48 C.F.R. §§ 9903.201–4(a), 9903.306(a), (e); FAR 52.230–2(a)(5) (all of which provide that the appropriate measure for damages for CAS noncompliance is the "increased costs" paid by the government as a result of the noncompliance). The court agrees with the plaintiffs that to the extent the transferred surplus provides the government with the benefit of reduced future pension costs, that benefit cannot be ignored or the government will receive a potential windfall.[29],[30]

Second, the court finds that the DOD guidance providing that a seller could meet its CAS 413 segment closing adjustment obligation through a pension surplus transfer is persuasive support for the plaintiffs' conten-

---

29. The government's concern that without an adjustment of the portion of the pension surplus retained by the sellers the government will never recoup the full amount of the plaintiffs' segment closing adjustment obligations is unjustified. Because the CAS 413 segment closing adjustment calculation is made on the entire segment, the amounts owed to the government will either be satisfied by the benefit derived from the transferred pension surpluses or the plaintiffs will have to pay the remainder of their obligations to the government.

30. For an extensive discussion of the limitations set forth in 41 U.S.C. § 422(h), *see Lockheed Martin Corp. v. United States,* 70 Fed.Cl. 745, 753 (2006), in which the court reasoned as follows:

> [D]efendant is incorrect in suggesting that decreased costs associated with other fixed-price contracts it had with Lockheed cannot have the effect of diminishing or even eliminating the cost increases associated with the noncompliance of the CAS in question.... This result, of course, would be anomalous and provide the government with a windfall. More impor-

tantly, it is precisely the result that Congress sought to avoid in admonishing that—"[i]n no case shall the Government recover costs greater than the increased cost ... to the Government, in the aggregate, on the relevant contracts subject to the price adjustment." 41 U.S.C. § 422(h); *see also* 48 C.F.R. § 9903.201–4 (requiring a contracting officer to insert similar language in covered contracts). Indeed, while the statute limits this aggregation principle, stating that it applies "unless the contractor made a change in its cost accounting practices of which it was aware or should have been aware at the time of the price negotiation and which it failed to disclose to the Government," defendant has not alleged, let alone shown, that this limitation was triggered here. This court will not allow defendant to create out of whole cloth yet another exception to the aggregation rule— one that finds no support in common sense, let alone the statute, the regulations thereunder, or the guidance thereon.

tion that a pension surplus transfer may be used to satisfy a seller's CAS 413 segment closing adjustment obligation. Contrary to the government's assertion, the question of whether the plaintiffs are entitled to a credit towards their segment closing adjustment obligations for the portion of the pension surpluses transferred to the buyers does not involve a question of CAS interpretation, but is instead an issue of payment. The mechanism through which the government can be compensated for its over-contribution to a contractor's pension plan is in fact not an issue covered by the CAS. Matters of payment are within the exclusive province of the contracting agencies. *See, e.g., Boeing North Am., Inc. v. Roche,* 298 F.3d 1274, 1280 (Fed.Cir.2002) ("The concept of cost allowability concerns whether a particular cost can be recovered from the government in whole or in part. *Cost allocability here is to be determined under the [CAS]. Allowability of a cost is governed by the FAR regulations, i.e., the cost principles expressed in Part 31 of the FAR and pertinent agency supplements.*") (emphasis added); *United States v. Boeing Co.,* 802 F.2d 1390, 1393–94 (Fed.Cir. 1986) (providing that CAS 412 and 413 "govern[ ] the determination and measurement of pension costs, assignment of such costs to cost accounting periods and allocation of such costs to final cost objectives" but that the "allowability of costs is a matter of procurement policy as to which [DOD] has exclusive authority"). Thus, the views of DOD's IG and the DLA provide valuable insights into the options available to sellers to satisfy their CAS 413 segment closing adjustment obligations and shall be considered by the court in evaluating the parties' contentions.[31]

In the DOD Guidance, Pl.'s Ex. 125, the IG examined a case study involving a situation similar to those before the court in which a contractor transferred a portion of a segment's pension assets and liabilities to a buyer in connection with the sale of the segment. In the case study, the contractor's CAS 413 segment closing adjustment obligation to the

government applicable to the entire segment was approximately $120,000,000. *Id.* at 9–12 ("The amount was reduced from the $200 million allocable to the segment, but retained by the seller, by credits for employee contributions, commercial work and competitive awards."). Following the sale of the segment, the government sought a payment of its share of the segment closing adjustment from the contractor pursuant to CAS 413.50(c)(12). *Id.* at 10. The IG cited with approval the government's acceptance of a transfer of $120,000,000 to the buyer's pension fund to "offset pension costs on Government contracts for the foreseeable future" in satisfaction of the contractor's segment closing adjustment obligations. *Id.* at 11. According to the case study, to protect the government's share of the pension surplus, the buyer would "calculate pension costs separately for Government and commercial segments in accordance with CAS 413.50(c)(3). *The $120 million received as settlement [w]ould be allocated only to the Government segment of the pension plan of the transferred corporation.*" *Id.* at 11–12 (emphasis added).

In addition, the plaintiffs cite an April 19, 1988 letter written by a contracting officer with the DLA to Gould, Inc. regarding Gould's compliance with CAS 413.50(c)(12) in connection with its sale of business segments performing government contracts. Pl.'s Ex. 121. The letter provided:

[D]efense segment assets and actuarial liabilities are to be calculated in compliance with the Cost Accounting Standard cited [CAS 413.50(c)(12) ]. With respect [to] possible excess pension assets, it is our opinion that excess assets may be: (1) credit[ed] as an adjustment to Government contracts, (2) *paid to the purchaser of the segment for placement in the pension trust fund* or (3) in the form of a check made payable to the Government.

*Id.* at 1 (emphasis added).

The DOD Guidance and the DLA letter are supported by the language in the Credits

---

**31.** Unisys notes that there are sound reasons for DOD to want this result because a surplus transfer would benefit DOD through a cost reduction, whereas a cash payment may not necessarily benefit DOD directly. Unisys Reply Br. at 17

("In the real world, the Government usually prefers that surplus be transferred in a way that will benefit future contracts rather than paid into the Treasury.").

clause, 48 C.F.R. § 31.205–5, which provides the means for implementing the CAS 413.50(c)(12) segment closing adjustment. *See Allegheny Teledyne*, 316 F.3d at 1370; *Teledyne*, 50 Fed.Cl. at 182. Under the Credits clause, a contractor may satisfy its segment closing adjustment obligation through "*either a cost reduction* or by cash refund." 48 C.F.R. § 31.201–5 (emphasis added). The DOD Guidance cited a situation in which the government agreed to a transfer of pension surplus, which would provide a benefit in the form of reduced future pension costs, to satisfy a contractor's segment closing adjustment obligation. Similarly, the DLA letter specified that excess pension contributions could be repaid to the government through three different mechanisms, including a payment to the buyer of a segment. In both of these scenarios, endorsed by DOD, the seller could satisfy its segment closing adjustment obligation through the transfer of pension surplus leading to a future *cost reduction*, a result also contemplated by the Credits clause.[32]

In view of the foregoing, the court finds that the government's proposed narrow reading of the Credits clause is not supported.

Indeed, the government's contention that the Credits clause always requires that the cost reduction be achieved through contracts held by the seller runs directly counter to the above-cited DOD guidance. The court finds that in appropriate circumstances, such as those before the court, where segment sales have been reviewed and approved by the government and the transfer of pension assets and liabilities, including a surplus, has been approved by the government, satisfaction of the CAS 413 segment closing adjustment obligation may be achieved through the cost reductions the government will receive from its contracts with the buyer.

### D. The Amount of Benefit the Government Has Received from the Pension Surplus Transfer Is a Disputed Issue of Fact.

■ While the court agrees that the plaintiffs are entitled to apply the value of the benefit received by the government from the pension surplus transfers in satisfaction of their CAS 413 segment closing adjustment obligations, the exact amount of that benefit remains in dispute.[33] The government con-

**32.** The government's argument that the segment closing adjustment is inherently retrospective and must only account for the past performance of a contractor's pension fund is not relevant to the court's determination regarding future cost reductions. The government is correct that the segment closing adjustment *calculation* must be performed *at the time of the segment closing* on the pension assets and liabilities of *the entire segment*. However, the court finds today that, while a segment closing adjustment *calculation* must be performed at the time of the sale of a segment, a contractor's segment closing adjustment *obligation* may be satisfied, as provided in the Credits clause, by a future cost reduction to the government.

**33.** In support of their motions, GE offered the declarations of William T. Keevan, CPA and John B. McQuade, and the government offered the declaration of Gerard E. Reichel as expert witnesses. There were no objections as to the qualifications of any of the experts offered. On April 17, 2007, the court issued an order granting-in-part and denying-in-part the government's motion to strike the declarations of both Mr. Keevan and Mr. McQuade, striking from the record Mr. McQuade's declaration because the issues addressed by his declaration were premature (Mr. McQuade's declaration addressed the government's contention that "the present value of the benefit to the Government from the transferred

surplus in the hands of the buyer will *always* be less than the present value of a direct payment of a lump sum in the same amount." Def.'s Mot. Summ. J. at 27 (emphasis in original)). The court allowed Mr. Keevan's declaration. The declarations of Mr. Keevan and Mr. Reichel are particularly demonstrative of the parties' factual dispute regarding whether any benefit received by the government from the transferred surplus could be adequately tracked and quantified.

Mr. Keevan's declaration focused on the government's contention that, if GE's position regarding the surplus transfer were accepted, the government would be required to "undertake extensive monitoring in an effort—that demonstrably cannot succeed—to recover over the course of future years a benefit equal to the payment that GE owed upon the pension surplus it retained." Def.'s Mot. Summ. J. at 2; Keevan Decl. ¶ 5. Mr. Keevan asserted that memorandum records could be utilized by the government to ensure that the government would receive the full benefit of any surplus transferred by GE.

Specifically, Mr. Keevan stated that memorandum records could be used in at least three ways to ensure that a transferred surplus is properly applied to reduce the government's future pension costs; in each circumstance, the buyer would establish a memorandum record account at the time of the transfer reflecting the govern-

tends that its interest in the transferred surplus has been and will be diluted by the commercial work and government fixed price contracts that were a part of the sold segments.[34] The government also contends that the buyers did not, and could not feasibly, monitor and track the government's share of the surpluses transferred, and therefore the benefit actually derived by the government is wholly uncertain.

The plaintiffs argue in response that as a matter of law, the CAS guarantees that the government will receive the full benefit of the transferred pension surplus. Moreover, the plaintiffs maintain that the dollar value of pension surplus transferred so substantially exceeded the amount of their segment closing adjustment obligations to the government that the government could not possibly have received a benefit from the transferred pension surplus in an amount less than the full value of the plaintiffs' segment closing adjustment obligations.

The court finds that without additional fact finding, it cannot fully resolve the plaintiffs' motions for summary judgment on this issue at this time. First, a final segment closing adjustment calculation in accordance with this ruling has not been agreed to by the parties.[35] Until the plaintiffs' final segment closing adjustment obligations have been determined, the court cannot consider whether the pension surplus transfers were sufficient to meet the plaintiffs' CAS 413 segment closing adjustment obligations. In addition, whether and how the pension surplus has been accounted for in the hands of the buyers is disputed, and the plaintiffs will be required to show, as a matter of fact, that the government has received or will receive the benefit of the surplus in the hands of the buyers.

For these reasons, the exact amount of the transferred surplus the plaintiffs are entitled to apply towards satisfaction of their seg-

ment's share of the transferred surplus. Keevan Decl. ¶ 14. First, Mr. Keevan stated that, in the case of flexibly priced contracts, the buyer could use a memorandum record to track the "balance" of the government's share of the transferred surplus remaining, and could offset the government's annual pension costs against the balance of the buyer's surplus obligation to the government. *Id.* ¶ 15. Second, Mr. Keevan stated that the buyer's surplus obligation to the government could be considered by the parties in negotiating any post-transfer firm-fixed-price contracts to reduce the cost to the government of such contracts. *Id.* ¶ 16. Finally, Mr. Keevan stated that the buyer and the government could agree to a reduction of price on firm-fixed-price contracts to give the government credit for its share of the surplus. *Id.* ¶ 18. In each of the above circumstances, Mr. Keevan stated that "tracking and accounting for the use of the transferred surplus in the hands of the buyer through memorandum records *would be the responsibility of the buyer.*" *Id.* ¶ 20 (emphasis added).

In response, Mr. Reichel stated that CAS 412 and 413 would require a different method of accounting for transferred pension assets than that proposed by Mr. Keevan. Reichel Decl. ¶ 6. Specifically, Mr. Reichel stated that, when a buyer receives pension assets and liabilities from a former contractor, the buyer must decide whether to incorporate the pension assets and liabilities into an existing plan or to create a new pension plan. *Id.* ¶ 14. In either event, Mr. Reichel stated that the buyer must integrate the transferred pension assets and liabilities into the pension cost calculations required by CAS 412 and 413, *id.* ¶ 15, and that the buyer must in-

clude all pension fund assets, including those transferred as part of a segment closing transaction, in computing pension costs pursuant to CAS 413.40(b) and CAS 413.50(b)(2). *Id.* ¶ 16. Accordingly, Mr. Reichel stated that the government would only in rare cases enjoy the full benefit of the surplus transfer.

Mr. Reichel also stated that Mr. Keevan's proposed approach would not be practical because "both the seller and buyers can value the pension liability and surplus assets (if any) differently (because they use different actuarial assumptions and actuarial cost methods)" so that the pension assets may have a different value in the hands of the buyer than they did to the seller, and the government may not receive the same benefit as it would at the time of the segment closing. *Id.* ¶ 25.

As stated above, these disputed issues will be resolved in the next stage of the litigation.

34. The government also asserts that the possible economic benefit of a partial transfer of just the government's share of pension assets would be diminished by "the normal operation of CAS-compliant pension cost calculations by the buyer," *see supra* note 9, and that the government's share of the transferred surplus would serve to reduce pension costs "for all customers of the segment, including commercial customers." Def.'s Reply Br. at 8 n. 3.

35. GE asserts that it submitted its final segment closing adjustment calculations for both GEA and MAO to the CO on March 31, 1988. However, the government has never approved these calculations.

**152**

ment closing adjustment obligations cannot be resolved at this time. In the next phase of this litigation, the plaintiffs will be given the opportunity to prove what benefit, and how much of a benefit, the government has derived or will derive as a result of the surplus transfers, after which time the court will be able to determine whether the plaintiffs have met their CAS 413.50(c)(12) segment closing adjustment obligations or whether they have some remaining liability stemming from their segment closing adjustment obligations to the government.

### CONCLUSION

For all of the foregoing reasons, GE's motion for partial summary judgment on the surplus transfer issue is **GRANTED–IN–PART** and **DENIED–IN–PART** and the government's motion for partial summary judgment on the surplus transfer issue is **GRANTED–IN–PART** and **DENIED–IN–PART.** The court finds that CAS 413.50(c)(12) required GE to perform a segment closing adjustment calculation on the entire segment in connection with the sales of GEA to Martin Marietta and MAO to Westinghouse. If GE can demonstrate that the government derived a measurable benefit from the pension surpluses transferred by GE to Martin Marietta and Westinghouse at the time of the sales of GEA and MAO, then the court finds that GE will be entitled to a credit towards its segment closing adjustment obligation for the amount of the benefit derived by the government.[36]

The parties shall file a Joint Status Report no later than **Friday, October 31, 2008** proposing the next steps in this litigation.

**IT IS SO ORDERED.**

---

**36.** This holding applies to the dispute in *Unisys* as well. If Unisys can demonstrate that the government derived a measurable benefit from the pension surpluses it transferred to Loral, Unisys will be entitled to a credit towards its segment closing adjustment obligation for the amount of that benefit.