Opinion for the court filed PER CURIAM. Opinion dissenting-in-part filed by Circuit Judge GAJARSA.
*1372 PER CURIAM.
At issue in this appeal are the calculation and payment of segment closing adjustments associated with the sale of certain business units by DIRECTV Group, Inc. (“DIRECTV”). The United States (“Government”) appeals the decision of the United States Court of Federal Claims in DIRECTV Group, Inc. v. United States, 89 Fed.Cl. 302 (2009), granting summary judgment in favor of DIRECTV. For the reasons stated below, we affirm.
BACKGROUND
This appeal relates to the application of particular accounting regulations when a segment of a company is sold and the sale includes the transfer of defined benefit pension plans. A defined benefit pension plan is “a pension plan in which the benefits to be paid, or the basis for determining such benefits, are established in advance and the contributions are intended to provide the stated benefits.” 48 C.F.R. § 31.001 (2010). In simple terms:
Defined-benefit plans guarantee fixed payments to retired employees, leaving the company responsible for ensuring that sufficient funds will be available. Companies therefore must make assumptions regarding, inter alia, the amount of money they expect to pay in the future, and the expected performance of the investments held by their pension plans. Based on these assumptions, companies determine how much money to invest in the plan in a given period so that future liabilities will be met.
Gates v. Raytheon Co., 584 F.3d 1062, 1064 (Fed.Cir.2009).
In the case of cost-type Government contracts, the contributions made on behalf of covered employees are paid by the Government as a part of the cost of the contracts. Id. Like contributions made by the employer-contractor, the amount of the Government’s contributions to the plan depends on actuarial assumptions regarding mortality rate, employee turnover, compensation levels, pension fund earnings, changes in values of pension fund assets, etc. See 4 C.F.R. § 413.30(a)(1) (1978). The differences between these ex ante assumptions and actual experience translate into actuarial gains and losses. Id. § 413.30(a)(3).
To achieve uniformity and consistency in the accounting principles followed by Government contractors, Congress authorized the Cost Accounting Standards Board “to make, promulgate, amend, and rescind cost accounting standards and interpretations thereof_” 41 U.S.C. § 422(f)(1). One of these standards, Original Cost Accounting Standard (“CAS”) 413.50, regulated the assignment of actuarial gains and losses, the valuation of the assets of a pension fund, and the allocation of pension costs to a contractor’s various business segments.[2] 4 C.F.R. § 413.50 (1978). To *1373 prevent volatility in the amounts of pension costs charged to the Government, that standard also required certain pension plans to amortize actuarial gains and losses over a fifteen year period. Id.
This amortized adjustment process fails, however, when the segment is closed, i.e., whenever “the segment’s contracts have become separated or closed off from the pension costs” such that “there are no future periods in which to adjust ... [the] pension costs.” Allegheny Teledyne, Inc. v. United States, 816 F.8d 1366, 1374 (Fed.Cir.2003) (internal quotation omitted). In such a case, the contractor is required to “determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment,” with the difference representing “an adjustment of previously determined pension costs.” 4 C.F.R. § 413.50(c)(12) (1978). This difference is a “segment closing adjustment” to be applied to the contract cost. In short, the Government and contractor terminate the amortization and adjust the outstanding pension obligations by allocating any then-existing surplus or deficiency between them.
At issue are segment closing adjustments resulting from DIRECTV’S sale of two segments. The first segment closing occurred on December 17, 1997, when DIRECTV (formerly, Hughes Electronics Corporation) completed a spin-off of its defense business units and sold those units to Raytheon Company (“Raytheon”). In connection with the Raytheon transaction, the parties stipulated that DIRECTV transferred to Raytheon $5,774,655,148 in pension assets and $3,310,028,559 in pension liabilities, resulting in a net transfer of $2,464,626,589 in surplus pension assets associated with the transferred segment. The second segment closing occurred on October 6, 2000, when DIRECTV sold its satellite business units to The Boeing Company (“Boeing”). In connection with that transaction, the parties stipulated that DIRECTV transferred to Boeing $1,843,930,981 in pension assets and $1,037,344,156 in pension liabilities, resulting in a net transfer of $806,586,825 in surplus pension assets associated with the transferred segment. In both transactions, DIRECTV retained a relatively small portion of the surplus pension assets.
By letters dated August 2, 2001, and October 6, 2003, the Government notified DIRECTV of its initial findings that DIRECTV was in noncompliance with CAS 413.50(c)(12) based on the Raytheon and Boeing transactions, respectively. In each case, DIRECTV responded with a segment closing calculation, along with a claim for an interpretation of contract terms under the Contract Disputes Act of 1978. The Government issued a Contracting Officer’s Final Decision and Demand for Payment regarding the Raytheon transaction on December 12, 2003, in which it again asserted noncompliance with CAS 413.50(c)(12) and demanded payment of $68,695,891 based on the Government’s estimate of the segment closing adjustment. A similar decision regarding the Boeing transaction was issued on June 14, 2005, once again asserting noncompliance with CAS 413.50(c)(12) and demanding payment of $12,197,704.
To resolve the dispute, DIRECTV brought suit against the Government in the United States Court of Federal Claims. In its complaint, DIRECTV alleged that no segment closing adjustments were required because it transferred all of the pension plan assets and liabilities at issue to Raytheon and Boeing. Compl. ¶¶ 39, 52. DIRECTV therefore requested that the court “declare that DIRECTV’S *1374 cost accounting practices are in compliance with CAS 413 or, alternatively, that any noncompliance has not resulted in increased costs paid by the United States” and that DIRECTV has no liability for any segment closing adjustment in connection with the Raytheon and Boeing transactions. Compl. at 20-21. Substantively identical requests for relief were made by DIRECTV in its Second Amended Complaint. The Government then filed counterclaims for payment of the segment closing adjustments at issue.
The trial court granted DIRECTV’S summary judgment motion. Applying the same interpretation promulgated in General Electric Co. v. United States, 84 Fed.Cl. 129 (2008) (“GE II”), the trial court concluded that Original CAS 413 mandated that any segment closing adjustment was to be calculated based on the assets and liabilities of the entire segment, including those transferred to the buyer of the segment. DIRECTV, 89 Fed.Cl. at 306-08. The trial court rejected the Government’s argument that, absent an express agreement with the Government, DIRECTV could not satisfy its CAS 413 closing adjustment through cost reductions attributable to the segment buyers. More specifically, the trial court found that neither the Allowable Cost and Payment clause, 48 C.F.R. § 52.216-7(h)(2), nor the Credits provision, 48 C.F.R. § 31.201-5, of the Federal Acquisition Regulation (“FAR”) prohibited DIRECTV from taking credit for cost reductions attributable to Boeing and Raytheon. Id. at 308-09.
The Government conceded in its summary judgment brief that if the segment closing adjustments were calculated in accordance with the logic expressed in GE II, the transfers made by DIRECTV to Raytheon and Boeing resulted in benefits to the Government — in the form of cost reductions on contracts held by the transferees — greater than the amount DIRECTV owed the Government following the segment closings. Id. at 307. The trial court also determined that the CAS authorizing legislation, 41 U.S.C. § 422(h)(3), prohibited a windfall to the Government, as would occur if DIRECTV were required to make a direct payment to the Government in addition to the cost reductions already provided by Raytheon and Boeing based on the transfer of surplus pension assets. Id. at 310. In short, the trial court concluded that the Allowable Cost and Payment clause and the Credits provision did not prohibit DIRECTV from satisfying its segment closing adjustment obligations via cost reductions attributable to Raytheon and Boeing.
The Court of Federal Claims had jurisdiction over DIRECTV’S complaint pursuant to 41 U.S.C. § 609(a), and over the Government’s counterclaims pursuant to 28 U.S.C. §§ 1503 and 2508. Final judgment was entered on October 16, 2009. This court has jurisdiction over the Government’s timely appeal pursuant to 28 U.S.C. § 1295(a)(3).
STANDARD OF REVIEW
This court reviews de novo a grant of summary judgment by the Court of Federal Claims. Salman Ranch Ltd. v. United States, 573 F.3d 1362, 1370 (Fed.Cir.2009). “A motion for summary judgment should be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.” RCFC 56(c)(1). In determining whether there are genuine issues as to material fact, “[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 *1375 (1986). As issues of law, we review without deference the Court of Federal Claims’s interpretation of statutes, the CAS, and the FAR. Int’l Data Prods. Corp. v. United States, 492 F.3d 1317, 1321 (Fed.Cir.2007); Rumsfeld v. United Techs. Corp., 315 F.3d 1361, 1369 (Fed.Cir.2003); United States v. Boeing Co., 802 F.2d 1390, 1393 (Fed.Cir.1986).
Discussion
The Government raises two issues on appeal. First, the Government argues that the trial court erred by calculating segment closing adjustments based on the assets and liabilities of the entire segment, rather than only the assets and liabilities that DIRECTV retained. Second, the Government argues that the FAR required DIRECTV itself to pay any amount due as a segment closing adjustment, and that cost reductions provided by successor contractors are not an acceptable form of payment.
I.
We turn to the Government’s first argument that the trial court erred in calculating segment closing adjustments based on the surplus pension assets of an entire segment, rather than just those assets retained by DIRECTV. See DIRECTV, 89 Fed.Cl. at 305 (citing GE II, 84 Fed.Cl. at 131). Original CAS 413.50(e)(12), the regulatory authority on which the segment closing adjustments at issue are based, uses the word “segment” nine times:
If a segment is closed, the contractor shall determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated. The determination of the actuarial liability shall give consideration to any requirements imposed by agencies of the United States Government. In computing the market value of assets for the segment, if the contractor has not already allocated assets to the segment, such an allocation shall be made in accordance with the requirements of paragraph (e)(5)(i) and (ii) of this section. The market value of the assets allocated to the segment shall be the segment’s proportionate share of the total market value of the assets of the pension fund. The calculation of the difference between the market value of the assets and the actuarial liability shall be made as of the date of the event (e.g., contract termination) that caused the closing of the segment. If such a date cannot be readily determined, or if its use can result in an inequitable calculation, the contracting parties shall agree on an appropriate date. The difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously-determined pension costs.
4 C.F.R. 413.50(c)(12) (1978) (emphases added). Other than the introductory phrase, which triggers application of the provision “if a segment is closed,” each use of the word “segment” is preceded by the definite article “the,” and none is modified by language suggesting less than a full segment. See id. Such is the case with the operative language: “The difference between the market value of the assets and the actuarial liability for the segment represents an adjustment....” Id. (emphasis added). This use of a definite article, without other limitation as to quantity, necessarily describes an entire segment. See Shum v. Intel Corp., 629 F.3d 1360, 1367 (Fed.Cir.2010). We therefore conclude that Original CAS 413.50(c)(12) requires a segment closing adjustment based on the applicable assets and liabilities of the entire segment at issue.
*1376 Subsequent changes to CAS 413 support this conclusion. In 1995, the Board substantially amended Original CAS 413. See Cost Accounting Standards, 60 Fed.Reg. 16,534 (Mar. 30, 1995) (codified at 48 C.F.R. pts. 9903, 9904 (1996)). Among the changes was the addition of a provision governing partial transfers of pension assets and liabilities:
If a segment is closed due to a sale or other transfer of ownership to a successor in interest in the contracts of the segment and all of the pension plan assets and actuarial accrued liabilities pertaining to the closed segment are transferred to the successor segment, then no adjustment amount pursuant to this paragraph (c)(12) is required. If only some of the pension plan assets and actuarial accrued liabilities of the closed segment are transferred, then the adjustment amount required under this paragraph (c)(12) shall be determined based on the pension plan assets and actuarial accrued liabilities remaining with the contractor. In either case, the effect of the transferred assets and liabilities is carried forward and recognized in the accounting for pension cost at the successor contractor.
Id. at 16,552 (codified at 48 C.F.R. § 9904.413-50(c)(12)(v) (1996)) (emphasis added). Thus, rather than requiring an adjustment based on “the assets and the actuarial liability for the segment,” 4 C.F.R. 413.50(c)(12) (1978) (emphasis added), Revised CAS 413 requires that the adjustment be “based on the pension plan assets and actuarial accrued liabilities remaining with the contractor,” 48 C.F.R. § 9904.413-50(c)(12)(v) (1996) (emphasis added). We presume that when the Board acted to make this change, it meant for the amendment to have real and substantial effect. See Stone v. INS, 514 U.S. 386, 397, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995) (“When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.”).
In Allegheny Teledyne, 316 F.3d at 1380, we found it “illogical to say all the additional text of the [1995] amendment simply ‘clarified’ rights that already existed, especially in light of the several clear changes made to the segment closing provision.” We see no reason to deviate from that conclusion here. Accordingly, we affirm the trial court’s conclusion that Original CAS 413.50(c)(12) requires the segment closing adjustment to be based on the applicable assets and liabilities of the entire segment.
II.
Having determined the pool of assets and liabilities on which the segment closing adjustment is based, we turn next to how a surplus, if any, may be recouped by the Government. Although the CAS governs allocability, i.e., what portions of a cost are assigned to a particular segment or contract, the FAR generally governs whether a party may apply or recover that cost. See, e.g., Boeing N. Am., Inc. v. Roche, 298 F.3d 1274, 1280-81 (Fed.Cir.2002). On appeal, the Government claims that certain FAR provisions — the Allowable Cost and Payment clause, 48 C.F.R. § 52.216-7(h)(2), and the Credits provision, 48 C.F.R. § 31.201-5 — prohibit DIRECTV from satisfying its liability for segment closing adjustments via cost reductions attributable to the pension assets transferred to Raytheon and Boeing as successor contractors.
Since its promulgation in 1983, the Allowable Cost and Payment clause has provided, in relevant part:
The Contractor shall pay to the Government any refunds, rebates, credits, or other amounts (including interest, if any) accruing to or received by the Contrac *1377 tor or any assignee under this contract, to the extent that those amounts are properly allocable to costs for which the Contractor has been reimbursed by the Government.
48 C.F.R. § 62.216-7(h)(2) (2010); see also Establishing the Federal Acquisition Regulation, 48 Fed.Reg. 42102, 42512 (Sept. 19, 1988). This clause must be inserted in all cost-reimbursement contracts. 48 C.F.R. § 16.307(a)(1) (2010). The clause requires “the Contractor,” in this case DIRECTV, to pay the Government any amount owed. That obligation is implemented by the Credits provision, 48 C.F.R. § 31.201-5, which governs the acceptable forms of payment. See Allegheny Teledyne, 316 F.3d at 1370 n. 4. The Credits Clause, 48 C.F.R. § 31.201-5, states:
The applicable portion of any income, rebate, allowance, or other credit relating to any allowable cost and received by or accruing to the contractor shall be credited to the Government either as a cost reduction or by cash refund. See 31.205 — 6(j)(4) for rules related to refund or credit to the Government upon termination of an overfunded defined benefit pension plan.
The Government argues that the original contractor, DIRECTV in this case, must pay by “cost reduction or by cash refund” that originates with DIRECTV, not a successor contractor. It argues that a “refund” can only necessarily be of amounts paid to DIRECTV, or it would not be a refund. Therefore, it contends that any cost reduction must also come directly from DIRECTV because the terms “refund” and “reduction” are used interchangeably in the Credits Clause. The Government also notes that the Credits Clause refers to 48 C.F.R. § 31.205-6(j)(4) which requires the contractor that terminates a pension plan to make a payment directly to the Government. The Government further argues that the Allowable Cost and Payment Clause of the FAR also applies to the DIRECTV contract and requires that “the Contractor shall pay to the Government any refunds ...” 48 C.F.R. § 52.216-7(h)(2) (1998). It argues that the Court of Federal Claims’ interpretation of the Credits Clause contradicts the plain meaning of this provision.
DIRECTV responds that the Credits Clause does not preclude use of cost savings from a successor contractor to pay a segment closing adjustment. It argues that the words “refund” and “cost reduction” are separated by an “or” in the Credits Clause and that even if a refund would have to come from the original contractor, a cost reduction does not. It contends that the reference to § 31.205-6(j)(4) is irrelevant because it refers to termination of a pension plan. The pension plan was not terminated; it was transferred to a successor contractor.
We agree with the Court of Federal Claims that DIRECTV may rely on the cost reductions to the Government that occurred based on DIRECTV’S transfer of pension assets to successor contractors. We are not persuaded by the Government’s argument that the mention of the word “refund” in the Credits Clause requires that all payment come directly from the original contractor, DIRECTV in this case. The Credits Clause allows for repayment by either “a cost reduction or a cash refund.” Even if the word “refund” is limited only to payment by the originally paid contractor — an issue we do not decide — this case is about a “cost reduction.” There is nothing in the language of the Credits Clause that requires this “cost reduction” to be so limited. In the instant case, DIRECTV transferred pension assets to successor contractors that allowed the Government to reap the benefits it was entitled to had the transfer never taken *1378 place. This is certainly a cost reduction. As the obligated contractor, DIRECTV caused these cost reductions by transferring the pension assets. The Government cannot collect the segment closing adjustment for a second time simply because these cost reductions occurred as part of a successor contract. This type of payment is allowed by the plain language of the Credits Clause. Thus, we hold that the Credits Clause allows for payment by way of cost reductions that occur due to the transfer of pension assets to a successor contractor.[3]
The Government does not dispute that because of the transfer of pension asset surpluses from DIRECTV to Raytheon and Boeing, the Government received more savings from the successor contracts than DIRECTV would owe the Government absent such transfer. DIRECTV, 89 Fed.Cl. at 307. The Government does not adequately explain how its proposal for additional payment from DIRECTV avoids providing a prohibited windfall to the Government. The Court of Federal Claims correctly held that such a windfall is prohibited by the CAS statute. See 41 U.S.C. § 422(h)(3) (“In no case shall the Government recover costs greater than the increased cost ... to the Government, in the aggregate, on the relevant contracts subject to the price adjustment, unless the contractor made a change in its cost accounting practices of which it was aware or should have been aware at the time of the price negotiation and which it failed to disclose to the Government.”); GE II, 84 Fed.Cl. at 148.
The trial court correctly concluded that under the circumstances here, “where the undisputed evidence demonstrates that the Government received the value of DIRECTV’s CAS 413 segment closing obligation through a cost reduction from the successor contractors, the existence of a Government agreement in which the Government protected its interest in the pension asset surplus through a novation agreement or other means is not material.” DIRECTV, 89 Fed.Cl. at 311. The Credits Clause cannot require double payment. See id. at 309. The CAS regulations further support the trial court’s holding, stating that the Government may recover its segment closing adjustment through “any ... suitable technique.” 48 C.F.R. § 9903.306(f).
We are not persuaded by the Government’s arguments regarding the second sentence of the Credits Clause which states “[s]ee 31.205 — 6(j)(4) for rules related to refund or credit to the Government upon termination of an overfunded de-fíned-benefít pension plan.” The facts of this case do not amount to a “termination” of a pension plan. This is a transfer and, thus, the rules regarding termination do not apply. If a contractor truly terminates a pension plan, then it is clear that only that contractor can pay any closing adjustment — there are no future periods with a successor contractor for the Government to reap the rewards of any surplus. However, when a contractor transfers a pension, the Government continues to collect the benefits that it was entitled to had the pension never changed hands. Thus, the rules regarding pension “termination” are irrelevant to our analysis and the Court of Federal Claims was correct to hold that *1379 the Credits Clause allows payment of the segment closing adjustment through cost reductions that are the direct result of the transfer of pension surplus assets to a successor contractor.[4]
Strangely, the dissent in a complex web of interpretation reaches a result that neither party advocates. It performs an exhaustive historical analysis of the Credits Clause to arrive at a result that the Government — the beneficiary of the dissent’s proposed resolution — calls “absurd.” Appellant’s Br. 58. Under the logic of the dissent, any retained pension asset amounts to a “termination” of the pension under 48 C.F.R. § 31.205-6(j)(4). This means that if DIRECTV retained $1.00 of a $1B pension, then the pension has been “terminated” and that the relevant regulations require that refunds be paid by DIRECTV alone. Based on our analysis in Section I, unless the Government expressly agreed to the transfer of the other $999,999,999.00, DIRECTV would be liable for a segment closing adjustment on the full $1B, even though the subsequent contractor continued the pension with all future amortized adjustments. In this case, for example, the dissent’s construction would lead to double recovery by the Government of $273M — once in the form of a segment closing adjustment and again in the amortized adjustments by the subsequent contractor. It is not surprising that neither party requests this outrageous result.
The Court of Federal Claims correctly determined that DIRECTV’S segment closing obligations could be satisfied by the cost savings realized by the Government in the successor contracts. Further, the Government concedes that, under this analysis, it is not entitled any further payments. DIRECTV, 89 Fed.Cl. at 307. Thus, we affirm.
AFFIRMED.

. To be precise, Congress empowered a "Cost-Accounting Standards Board” to "promulgate cost-accounting standards designed to achieve uniformity and consistency in the cost-accounting principles followed by defense contractors and subcontractors under Federal contracts.” Act to Amend the Defense Production Act of 1950, Pub.L. No. 91-379, 84 Stat. 796 (1970) (codified at 50 U.S.C. § 2168 (repealed 1988)). It was this Cost-Accounting Standards Board that initially promulgated Original CAS 413. See Recodifi-cation of Cost Accounting Standards Board Rules and Regulations, 57 Fed.Reg. 14148 (Apr. 17, 1992). In 1988, Congress authorized a new "Cost Accounting Standards Board” within the Office of the Federal Procurement Policy Act to Amend and Extend the Office of Federal Procurement Policy Act, Pub.L. No. 100-679, 102 Stat. 4055, 4059-60 (1988) (codified at 41 U.S.C. § 422). The cost accounting standards promulgated by the original Board were recodified by the new Board, 57 Fed.Reg. at 14148, and are found *1373 as amended in Title 48 of the Code of Federal Regulations.

. The dissent is incorrect in its dramatic assertion that we create a "continuous vortex where the Government can be forced to recover its increased costs from any person." Dissent at 1383. The cost reductions in this case are the direct result of DIRECTV’s transfer of the pension assets. The pension continued as if there was never any change in contractors. We are not holding that any cost reductions unrelated to the original contractor and the pension transfer could be used to satisfy the debts.

. Contrary to the protests of the dissent, our decision in this section does not contradict the logic of Section I of this opinion. Dissent at 1381-82. In Section I, we determined that the term “segment” means a single segment, not a portion of a segment. In this section, we hold that the reference to "contractor” may refer to a subsequent contractor if a pension is transferred. These are two logically and grammatically distinct inquiries.